UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DAVID CARLOS WEBB,

        Petitioner,

    v.

KIM HOLLAND, Warden,

        Respondent.

No. 2:16-cv-01368 TLN AC

<u>FINDINGS AND RECOMMENDATIONS</u>

       Petitioner is a California state prisoner proceeding pro se with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This action proceeds on the petition filed on June 16, 2016,[1] ECF No. 1, which challenges petitioner's 2013 conviction for two counts of second degree burglary with use of a firearm. Respondent has answered, ECF No. 17, and petitioner filed a traverse.

BACKGROUND

I.    <u>Proceedings in the Trial Court</u>

  A. <u>Preliminary Proceedings</u>

       Petitioner was charged with assault of a police officer with a semi-automatic firearm, unlawful firearm activity, and two counts of second degree robbery. ECF No. 18-1 at 53–55.

---

[1] <u>See</u> <u>Houston v. Lack</u>, 487 U.S. 266 (1988) (establishing rule that a prisoner's court document is deemed filed on the date the prisoner delivered the document to prison officials for mailing).

The charges arose from two 2012 robberies and one 2012 incident involving a police operation to apprehend petitioner following the robberies.

Trial commenced on October 12, 2012. The court provided the jury with preliminary instructions that included the following:

> A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you that the People must prove something, I mean, they must prove it beyond a reasonable doubt. Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charges are true. . . .
>
> . . .
>
> You alone must judge the credibility or believability of the witnesses. In deciding whether testimony is true and accurate, use your common sense and experience. You must judge each witness by the same standards, setting aside any bias or prejudice that you may have. You may believe all, part, or none of any witnesses's [sic] testimony. Consider the testimony of each witness and decide how much of it you believe.
>
> In evaluating a witness's testimony, you may consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony. Some of the factors that you may consider are these: How well could the witness see, hear or otherwise perceive the things about which that witness testified? How well was the witness able to remember and describe what happened? What was the witness's behavior while testifying before you? Did the witness understand the questions and answer them directly? Was the witness's testimony influenced by a factor such as bias or prejudice, a personal relationship with somebody involved in the case, or a personal interest in how this case is decided?
>
> What was the witness's attitude about the case or about testifying? Did the witness make a statement in the past that is consistent or inconsistent with that witness's testimony? How reasonable is the testimony when you consider all the other evidence in this case? Did other evidence prove or disprove any facts about which that witness testified? Did the witness admit to being untruthful? Has the witness engaged in other conduct that reflects on his or her believability?
>
> Do not automatically reject testimony just because of inconsistencies or conflicts. Consider whether the differences are important or not. People sometimes honestly forget things, or make mistakes about what they remember. Also, two people may witness the same event, yet see or hear it differently.
>
> If you do not believe a witness's testimony that he or she no longer remembers something, that testimony is inconsistent with the witness's earlier statement on that subject; and finally, regarding

witnesses, if you decide that a witness deliberately lied about something significant in this case, you should consider not believing anything that witness says, or, if you think the witness lied about some things, but told the truth about others, you may simply accept the part that you think is true and ignore the rest.

ECF No. 18-4 at 62, 64–65.

In his opening statement, petitioner's lawyer argued that robbery victim and witness Terry Mitchell ("Mitchell") made multiple inconsistent statements. ECF No. 18-4 at 74. Counsel also commented that there "there is no evidence other than" Joaquin Raya ("Raya") and Mitchell saying they were robbed. Id. Regarding Mitchell's and Raya's identification of petitioner from photographs, defense counsel encouraged the jury in his opening statement to "pay close attention to the features so that when the witness is describing what he remembers the person looked like, you can then see how that applies to the photos." Id. at 79.

B. The Evidence Presented at Trial

The prosecution presented the following evidence regarding the March 24, 2012 Mitchell robbery. Mitchell testified that she was held up at gunpoint at approximately 2:00 a.m. on March 24, 2012 in a Kaiser emergency room parking lot in Vallejo, California. ECF No. 18-4 at 82–83. Mitchell testified that she was in an open door of the back seat of her car looking in her purse for her cell phone and "heard rapid footsteps coming up from behind" as if someone was running. Id. at 83–84, 86. She turned and saw a man about twenty feet away pointing a gun at her and running towards her. Id. at 84. As he neared, Mitchell kicked the man who then "got angry and shoved [her] back against the car" with his body. Id. at 85–86. Mitchell fell back into the car and the person with the gun jumped on top of her and jammed the gun into the side of her stomach several times. Id. at 88–89. Mitchell described the man's face as intimidating and looking at her as if to say, "Stop it." Id. at 90. After Mitchell settled down, the man took her purse, showed it to her, jammed the gun in her side again, then got off her and ran off with her purse. Id. at 91, 92. The police showed up within five minutes and Mitchell gave a description of the robber. Id. at 93–94.

When asked if she felt like she was able to get a good look at the person, Mitchell responded, "Oh, yes." ECF No. 18-4 at 94. Mitchell described the person as wearing all black

3

with a hood that obstructed part of the front of his face so that she could see his forehead, eyes, cheeks, and nose. Id. at 94–95. Mitchell testified that she "could see his eyes really well" and she could tell that he "was a light-colored black man." Id. at 94–95. She further described the robber as average size with what she thought was a mustache, but the bottom part of the hood was covering somewhere around his lip area. Id. at 96. When asked if Mitchell would recognize the person if she saw them again, Mitchell responded, "Oh, yes, sir." Id. at 101. Mitchell was asked if she saw the person in the courtroom and she identified petitioner. Id. When asked how she was able to confidently say she would recognize the person again, Mitchell testified that, "It's just a face you don't forget when they're on top of you." Id. at 102.

After the incident but while it was still fresh in her mind, officers showed Mitchell some pictures. ECF No. 18-4 102. Mitchell was told to look at the pictures, be honest, and not pick a photograph unless she was sure. Id. Mitchell testified that she was not so angry about what happened that she just wanted somebody held responsible. Id. Mitchell confirmed she wrote the following on the photograph she identified: "This is the person that looks like him that robbed me at gunpoint." Id. at 103–04. She also testified that she did not have any uncertainty as to whether or not that was the person, and that she "took [her] time and made sure [she] was positive." Id. at 104. Mitchell stated several times that she was positive about her identification of petitioner as the person who robbed her at gunpoint. See id. at 104–05. She reiterated that when she saw petitioner again, she "knew for sure from the picture to seeing him in person, it was that exact person." Id. at 105.

The Court of Appeal correctly described defense counsel's cross-examination as "vigorous[]." ECF No. 18-8 at 228. During cross-examination, Mitchell admitted that she recalled speaking with the police only "somewhat" because of the stress of the situation. ECF No. 18-4 at 110. Counsel questioned Mitchell regarding her prior testimony that she was behind the driver's side of the vehicle versus behind the passenger side of the vehicle when the robber approached. Id. at 122–24. Mitchell testified that the parking lot was "very well-lit" and that she saw the person making the footsteps coming toward her right at the moment she turned around. Id. at 126. Counsel asked Mitchell about her identification of petitioner from the photographs the

police showed her.  Id. at 144.  Mitchell testified that she "recognized the face right away, but [she] still took time to look just to be sure and took away the ones that [she] knew for sure were not the gentleman, and [she] wanted to be sure, so [she] probably looked at them for a good five minutes."  Id.  Counsel asked her if there was anything about the excluded photos that made her rule them out, and Mitchell responded, "No.  The other ones just didn't look anything like the person that I knew that it was" and "[t]he other ones just weren't Mr. Webb."  Id.  Regarding petitioner's hair, Mitchell testified that she did not know petitioner had hair at the time.  As the Court of Appeal aptly noted, "Counsel asked Mitchell a number of questions about the assailant's hood and [petitioner's] shaved head in the photo.  Mitchell testified consistently that she could not see any hair on [petitioner's] head and did not know whether he had any hair because of the hood."  ECF No. 18-8 at 232 n.5.[2]  Also during cross-examination, Mitchell confirmed that the robbery was traumatizing for her, she was shaking because of the trauma, and she had nightmares and fear after the incident.  ECF No. 18-4 at 153.  When asked if any of the emotional turmoil that she went through could have affected her ability to see and recognize the person who was at her vehicle with the hooded jacket, Mitchell responded, "No, sir."  Id. at 154.

During the prosecution's redirect examination, Mitchell confirmed that the lighting from the parking lot illuminated the car.  Id. at 155.  She also testified that she had "[a]bsolutely not" tried to embellish or change her story to have some sort of effect on the case, and that her memory of the incident had "stayed the same."  Id. at 155–57.  The prosecutor asked Mitchell whether she felt pressured to identify any particular person to which Mitchell responded, "Oh, absolutely not.  If anything, they were -- they, 'Don't identify anybody if I didn't recognize anybody[.']"  Id. at 158.  Mitchell also did not feel that the photographs were presented in a way that one stood out among the others.  Id.

The prosecution presented the following evidence regarding the Raya robbery on April 7, 2012.  Raya testified that he was in the business of selling medical marijuana through

---

[2]  The undersigned has independently reviewed the trial record and confirms the accuracy of the state court's recitation of the evidence presented at trial that is summarized herein, including the undercover operation summarized below.

advertisements on websites including BudTrader.com.  ECF No. 18-4 at 176–77.  Raya received a
text message from a person wanting to purchase medical marijuana, and he ultimately agreed to
sell the person approximately two ounces to a quarter pound of marijuana for $800 or $900.  Id. at
178, 80.  Raya had a "couple thousand" in cash in his backpack because he was "going to look at .
. . some rims and some car audio" equipment after he sold the medical marijuana.  Id. at 180–81,
187.  When Raya arrived at the meeting spot, an apartment building, he stayed on the phone with
the person until he saw him emerge with another man.  Id. at 181–82, 184.  Raya identified
petitioner as one of the men who emerged from the apartment building.  Id. at 182.  Raya
described the man's voice on the phone as "[s]oft, feminine."  Id.  While still on the phone, Raya
asked the man to come out to his car, but the man refused so Raya got out of his car and went to
him.  Id.  Raya testified that he spoke with the man who had the same voice he heard on the
phone.  Id. at 183–84.  Raya was led towards the apartment.  Id. at 184.  The men were concerned
Raya had a weapon and all three men pulled up their shirts to show they did not have weapons.
Id. at 185.  As they walked towards the apartment complex Raya started to get a "bad feeling
because of the way they were acting," which he described as "really scared, sketchy, like
nervous."  Id. at 186.  The men asked to look in Raya's backpack again to confirm he did not
have a gun.  Id. at 188.  When Raya showed them inside the backpack again, petitioner grabbed
the bag out of his hand and the other man pulled out a gun.  Id. at 188–89.

When asked if he got a good enough look at the two people that he would have been able
to recognize them after that date, Raya responded, "Yes."  Id. at 195.  Raya testified that he was
sure nothing was covering petitioner's face and he was not wearing a hat or hood.  Id. at 196.
After the robbery, Raya was contacted by the police to look at some photographs.  Id. at 197.  The
police did not indicate they were hoping he would pick out a certain person and Raya did not feel
any pressure to make some sort of identification.  Id. at 197.  Raya confirmed that he selected
petitioner as the person that robbed him and wrote next to petitioner's photograph, "This is the
guy that robbed me."  Id. at 198.

Raya testified that he did not stop advertising on BudTrader.com and put up a new
advertisement the next day with a different phone number.  Id. at 199–200.  Raya received a

response to the new ad and recognized the text message as coming from a number associated with the robbers. Id. at 200–01. Raya had a conversation with the person and recognized the voice as the same man he spoke with on the phone previously. Id. at 202. Raya contacted the police to let them know the same man who robbed him was calling him again at a different number. Id. at 201.

Raya confirmed that he identified petitioner as the person who robbed him. ECF No. 18-4 at 204. Raya did not think it was possible that his in-court identification was based on the fact that the police had showed him a photograph, as opposed to the fact that he was there during the robbery. Id. Raya was certain about who he was identifying as the person who robbed him. Id. at 205.

During cross examination, defense counsel questioned Raya about his recollection of the details of the robbery and his identification of petitioner. See generally ECF No. 18-4 at 205–38. This included whether Raya recalled telling the officers that he had marijuana in his backpack and the money on his person, id. at 211, 219–22; Raya's identification of the two men who robbed him, id. at 216, 237–38; Raya's physical description of the perpetrators, including whether one of them had hair or a shaved head, id. at 217–19, 225, 237–38; the differences in the darkness of skin between the person Raya identified and the other photographs, id. at 221–22; whether Raya has a clear recollection of some of the events that happened, id. at 227; Raya's description of the clothing on the person who robbed him and whether the perpetrators were wearing jewelry or had tattoos, id. at 229–30, 233; and Raya's recollection of what time the robbery occurred and how much time passed during the robbery, id. at 233–36.

Officer Steve Cheatham ("Cheatham") met with Raya to show him photographs because they recently had a similar incident and he "wanted to see if [Raya] recognized anybody from when he was victimized." ECF No. 18-4 at 244. Cheatham showed Raya six eight-by-ten photographs of individuals and explained to him that "[t]he person who may have victimized him may or may not be in the[] photographs." Id. Cheatham did not suggest to Raya which of the photographs was a person of interest for him. Id. Cheatham testified that he put down photo number one and Raya looked at it, Cheatham put down photo number two and Raya looked at it,

and when Cheatham "started putting down number three, [Raya] immediately told [him] that this was the person that had robbed him." Id. at 246. Cheatham said Raya reacted "[e]xtremely quickly" to petitioner's photograph. Id. at 248. Raya told Cheatham that "the subject that he had identified in the photo was the subject who took his marijuana from him while [a] second subject pointed a gun at him." Id. at 246.

The prosecution also presented evidence regarding an undercover operation on April 13, 2012:

> The same person who made the original contact with Raya to purchase medical marijuana on April 7 subsequently texted him again, this time in response to a new on-line ad put up by Raya the day after he was robbed. Raya responded to the text message, but did not let on that he was the victim from the earlier incident. Raya gave this information and the person's telephone number to the Vallejo police. Officer Fabio Rodriguez, posing as a marijuana distributor, called the phone number and spoke with defendant, who again identified himself as La John Hutchins. In a series of six or seven phone calls, Rodriguez set up a meeting with defendant to sell marijuana. Rodriguez spoke with the same person on the phone each time; the person had a somewhat feminine voice. The person wanted to meet at an apartment complex about a block and a half away from the complex where Raya was robbed and within two miles of Kaiser Hospital where Mitchell had been robbed a few weeks earlier.
>
> Vallejo Police Department Sergeant Kevin Coelho supervised the operation, with the goal of apprehending defendant. Coelho chose a nearby church parking lot as the safest place to attempt the arrest in case shots were fired. The meeting was planned for 2:00 or 3:00 in the afternoon; it was considered an "extremely high-risk" operation.
>
> Detective Jason Potts, posing as a marijuana dealer, spoke with defendant and negotiated a price to sell 20 ounces of marijuana. Potts noticed that the voice of the person he spoke with was polite and had an almost feminine tone. On April 13, after finally persuading defendant to meet in the church parking lot, Potts parked there in an undercover vehicle. Several minutes later, Potts saw defendant walking across the lot. Potts called the phone number again to see defendant answer the phone. Instead of answering, defendant patted his pants, and he and Potts exchanged waves. At this point, Potts recognized defendant based on prior contacts, thinking to himself, "Oh, that's David Webb," as soon as defendant waved at him. Potts called dispatch during the incident and asked for a photo of David Webb.
>
> At that point, with defendant less than 40 feet away, Potts made the bust signal and threw a flash bang device. Defendant fell to the ground and then got up and ran. Sergeant Coelho and Detective Kent Tribble had been monitoring the situation from a van nearby;

8

the van accelerated toward Potts and defendant. Coelho saw Potts and defendant running. Defendant was wearing a white jacket and dark jeans. Potts had started to give chase, but turned around when he realized that he had left a loaded firearm in his vehicle and other officers were chasing defendant. At that moment, defendant reached into his waistband area and looked at Potts over his shoulder. From about 15 feet away, officers saw defendant digging in his pocket for something as he ran. Detective Tribble thought defendant was reaching for a firearm and shouted, "He's got a gun. He's getting a gun." Tribble then saw the rear portion of the gun defendant was attempting to remove. Sergeant Coelho saw defendant move his left hand to the left side of his waistband and remove a gun with his right hand from the waistband. Both Coelho and Tribble fired at defendant to protect Potts. Defendant ran up the stairs into the apartment complex next to the church. Coelho did not shoot again because defendant was no longer an immediate threat. Defendant was able to run past the perimeter officers and escape immediate apprehension.

The day after the failed undercover operation, Detective Tribble conducted a follow-up investigation at the apartment complex and found a white jacket that looked like the one defendant had been wearing. The jacket had bullet entry and exit holes in the upper portion of the left sleeve. Tribble viewed a hospital photograph of an African-American man with an exit wound in the left shoulder that was consistent with the location of the hole in the jacket. Tribble identified defendant as the person in the photograph.

On April 15, 2012, Officer Mathew Mustard interviewed defendant at the Solano County Jail. Defendant had a gunshot wound to his left shoulder and did not deny that he had been shot by police on April 13.

Officer Mustard reviewed phone records for the cell phone number involved in the Raya robbery and the undercover operation. The cell phone number was associated with defendant's name and date of birth. The cell phone records also contained evidence of communications with Raya on April 7, 2012. Text messages showed the name "La John Hutchins" when the user of the phone attempted to make purchases of marijuana.

ECF No. 18-8 at 224–26; see also ECF No. 184-4 at 253–290; ECF No. 18-5 at 3–38, 40–55, 60–125, 138–76; 183–213.

The court discussed jury instructions with counsel before the presentation of evidence ended. CALCRIM No. 315 was raised by the court, which noted that the instruction was "requested by the defense." ECF No. 18-5 at 249. Petitioner did not request a modification of the instruction. Id. On the court's own motion, and after hearing arguments from the prosecution

////

and defense counsel, Count 1 was eliminated under California Penal Code section 1118.1.[3] Id. at 293. The court then introduced counsel for closing arguments, and directed the jury that, "[a]s you listen to the attorneys argue, keep in mind, again, that what they say is not evidence" and "[y]ou will be the ultimate arbiters of what the facts in this case have been." ECF No. 18-5 at 296.

During the prosecution's closing argument, defense counsel made several objections that the court addressed. In overruling counsel's objection on the ground that the prosecutor's argument misstated the law, the court explained that it "will state the law to the jury and will tell the jury that to the extent the attorneys say something different, they're to disregard it." ECF No. 18-5 at 299. The prosecutor made the following arguments during closing:

> What we do want is, we want credible testimony from people about what they observed, so you could imagine that when someone goes through an event like Ms. Mitchell went through, she's not keeping track of time; she's not making measure of distances, but when she's got that person laying on top of her face-to-face, inches away, jamming a gun into her side, that face is burned into her memory.
>
> And she sat here in front of you and she pointed to the defendant, I don't know how many times, I don't know how many different ways, and said, "I don't have any doubt that that is the person that robbed me at gunpoint on that day", that's the way you want your system to work, so someone like that can get justice.
>
> Let's talk about the sort of person that you would have to believe Ms. Mitchell to be in order for her to say those sort of things under oath and not really know it for sure. She understands, and I hope you remember this little line of questioning that I tried to go through with each Ms. Mitchell and Mr. Raya, about whether or not they understood just generally the consequences of someone being identified as a robber being brought to trial and that sort of thing.
>
> The point of that was very specific, and that is that it would take an evil, horrible person to sit up there on the witness stand, knowing generally what's at stake in this sort of situation, and without being a hundred percent sure, even though they're testifying that they're a

---

[3] California Penal Code section 1118.1 provides: "In a case tried before a jury, the court on motion of the defendant or on its own motion, at the close of the evidence on either side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal. If such a motion for judgment of acquittal at the close of the evidence offered by the prosecution is not granted, the defendant may offer evidence without first having reserved that right."

> hundred percent sure, point to him and say, "He's the one that robbed me". That would take a soulless, horrible person, and whatever evidence you have in this case, there is no evidence, or none reasonably, that Ms. Mitchell is that sort of human being that would do that to Mr. Webb, . . . unless she was sure.
>
> She wasn't so angry about what happened that she wanted to have someone held responsible. She saw him do it, and she told you about it, and you should convict him on it. It's as simple as that, if the system works.
>
> The same thing is true for Mr. Raya. He wasn't showing some sort of enthusiasm for being brought to Court. It didn't seem like he was thrilled about doing it, but he's telling you about something that happened to him, and he's trying to explain it to you as best as he can, based on the memory that he has of what happened.
>
> Just like Ms. Mitchell, just like anyone else who would have been put through this situation that he was, he is not going to remember every single detail. You will not get in your jury instructions the law that you will be asked to consider in this case, a jury instruction that says: If someone gets a detail wrong, it means they're lying.
>
> You'll get guidelines on how to determine credibility. Those guidelines are consistent with your common sense, and that's why the system works, because you are not supposed to come in here, after having lived your life making decisions based on common sense and good judgment, throw that out the window and say, "You know what? Because this person said some other distance at a preliminary hearing than they did at trial, I'm not going to believe what they say".
>
> The system wouldn't work if we did that. We would not be able to convict people who commit these sort of crimes.

ECF No. 18-6 at 3–5. Defense counsel lodged an objection that the prosecutor was misstating the law as to the procedures applicable to inconsistent statements and testimony. Id. at 5. The court overruled the objection, reiterating that it "already indicated to the jury that [it] will be giving them the law regarding how to interpret witness testimony, so counsel can argue . . . ." Id. The prosecutor concluded his opening argument with the following comments regarding Mitchell and Raya:

> I don't expect that there will be any argument about whether or not Ms. Mitchell is an honest person, and whether or not Mr. Raya is an honest person. That would be an absurd argument to suggest that they're dishonest people coming in here and telling you about what they've been through, but whether or not that's argued, you saw them and you got to see who they are and what their memory is and how solid it is, and you'll get to make that determination, and

ultimately, it's because you get to make this determination that the system works . . . .

ECF No. 18-6 at 17.

Petitioner's counsel zealously argued misidentification in his closing statement.  See generally ECF No. 18-6 at 20–46.  Counsel challenged the reliability of Mitchell's identification, arguing that Mitchell's handwriting on petitioner's photograph changed, id. at 23; Mitchell did not realize the scope of the seriousness of what she was doing, id.; Mitchell forgot the date of the robbery, id. at 24; she presented more than one account of the robbery, id. at 24, 26; Mitchell's account does not "make[] any sense at all," id. at 25, 27; "[w]hatever happened to Ms. Mitchell, it wasn't [petitioner] that did that," id. at 26; the "different stories" are "so substantial it amounts to an absolute doubt," id. at 27; that eyewitness identification "is probably one of the weakest, most unreliable bits of evidence that we put in Court here," id. at 28; and the discrepancies in Mitchell's testimony "are so substantial that [the jury] can't possibly reasonably using [its] common sense find that [the charge] has been proven," id. at 29.

Similarly, petitioner's counsel included the following arguments in his closing statement regarding Raya: the photos given to Raya were "put together with the specific intention of [petitioner's] picture standing out, ECF No. 18-6 at 30; there is a problem with connecting petitioner to the phone calls with Raya, id. at 31; someone would not put "cash for rims and audio stuff in the backpack with the marijuana that you are taking around and showing people and stuff," id. at 33; and Raya is "not imputed with some kind of automatic credibility because he complained to the police that he had been robbed," id. at 34.

In sum, petitioner's counsel argued during his closing statement that nothing was given to the jury to substantiate Mitchell's identification and Raya was "just mixed up."  ECF No. 18-6 at 45–46.

During the court's administration of jury instructions, the court explained to the jury: "Nothing that the attorneys said was evidence.  In their opening statements and closing arguments, the attorneys discussed the case, but their remarks are not evidence.  Their questions

////

12

are not evidence, and only the witness's answers are evidence." ECF No. 18-6 at 60. The court further explained to the jury:

> You must judge the testimony of each witness by the same standards, setting aside any bias or prejudice that you may have. You may believe all, part, or none of any witness's testimony. Consider the testimony of each witness and decide how much of it you believe.

ECF No. 18-6 at 64. The court also read CALCRIM No. 315 to the jury:

> You have heard eyewitness testimony identifying the defendant. As with any other witness, you must decide whether an eyewitness gave truthful and accurate testimony.
>
> In evaluating identification testimony, consider the following questions: Did the witness know or have contact with the defendant before the event? How well could the witness see the perpetrator? What were the circumstances affecting the witness's ability to observe, such as lighting, weather conditions, obstructions, distance and duration of observation? How closely was the witness paying attention?
>
> Was the witness under stress when he or she made the observation? Did the witness give a description, and how does the description compare to the defendant? How much time passed between the event and the time when the witness identified the defendant? Was the witness asked to pick the perpetrator out of a group? Did the witness ever fail to identify the defendant?
>
> Did the witness ever change his or her mind about the identification? *How certain was the witness when he or she made an identification?* Are the witness and the defendant of different races? Was the witness able to identify the defendant in a photographic or physical line-up? Were there other circumstances affecting the witness's ability to make an accurate identification?

ECF No. 18-6 at 66–67 (emphasis added).

### C. Outcome

The jury found petitioner guilty of counts 3 (second degree robbery upon Raya) and 4 (second degree robbery upon Mitchell), including finding true that a principal was armed with a firearm in the commission of the offenses. ECF No. 18-6 at 81–82. The jury deadlocked on count 2 (unlawful possession of a firearm), which was later dismissed. Id. at 75, 80, 85.

Petitioner filed a motion for new trial, arguing that he was denied a fair trial by the prosecutor's closing comments to the jury that petitioner should have presented witnesses in his defense. ECF No. 18-1 at 131–38. The trial court heard the motion on February 25, 2013. ECF

No. 18-6 at 90–111.  After hearing arguments, the trial court denied the motion for new trial, finding that the prosecutor did not commit misconduct in making references to petitioner's ability to call witnesses.  Id. at 112.

The trial court held a judgment and sentencing hearing on March 18, 2013.  ECF No. 18-6 at 114; see also ECF No. 18-1 at 141–48 (the People's sentencing brief).  Petitioner's counsel advocated for a lesser enhancement, again attempting to argue that "there is not a strong evidentiary basis to that case in identification, and [petitioner] adamantly denies being involved."  Id. at 116–19.  Mitchell appeared and addressed the court during sentencing, stating, in part:

> There was a gun.  It was a gun from the very beginning.  I've never wavered on that; and yes, it was [petitioner] that was there that night, and when I identified him through the line-up of the given choices of pictures, there was no question in my mind who it was.

ECF No. 18-6 at 121.

Ultimately, the court sentenced petitioner for a term of 15 years for count 4 (the Mitchell robbery), and one year and four months for count 3 (the Raya robbery), for an aggregate prison term of sixteen years and four months.  Id. at 130–31.

II.      Post-Conviction Proceedings

Petitioner timely appealed, and the California Court of Appeal affirmed the judgment of conviction on November 25, 2015.  ECF No. 18-8 at 221–39.  The California Supreme Court denied review on February 17, 2016.  ECF No. 18-8 at 293.

On September 28, 2014, petitioner filed a petition for writ of habeas corpus in the Court of Appeal and a motion to consolidate the proceeding with the pending appeal.  ECF No. 18-8 at 158–204.  On September 10, 2015, the Court of Appeal denied the motion to consolidate the appeal and stated the petition for writ of habeas corpus would be considered with the appeal.  Id. at 219.  The Court of Appeal issued a reasoned opinion on petitioner's appeal, id. at 221–39, and separately denied the petition for writ of habeas corpus without comment on November 25, 2015, id. at 241.

Petitioner then filed a habeas petition in the California Supreme Court, ECF No. 18-8 at 266–84, which was denied without comment on February 17, 2016.  ECF No. 18-8 at 295.

By operation of the prison mailbox rule, the instant federal petition was filed June 16, 2016.[4]  ECF No. 1.  Respondent answered on January 6, 2017.  ECF No. 17.  Petitioner's traverse was docketed on February 6, 2017.  ECF No. 21.

STANDARDS GOVERNING HABEAS RELIEF UNDER THE AEDPA

28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides in relevant part as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The statute applies whenever the state court has denied a federal claim on its merits, whether or not the state court explained its reasons.  Harrington v. Richter, 562 U.S. 86, 99 (2011).  State court rejection of a federal claim will be presumed to have been on the merits absent any indication or state-law procedural principles to the contrary.  Id. at 99 (citing Harris v. Reed, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis)).  "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely."  Id. at 99.

The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal principle or principles" previously articulated by the Supreme Court.  Lockyer v. Andrade, 538 U.S. 63, 71–72 (2003).  Only Supreme Court precedent may constitute "clearly established Federal law," but courts may look to circuit law "to ascertain whether . . . the particular point in

////

---

[4]  See supra n.1.

15

1  issue is clearly established by Supreme Court precedent." <u>Marshall v. Rodgers</u>, 133 S. Ct. 1446,

2  1450 (2013).

3      A state court decision is "contrary to" clearly established federal law if the decision

4  "contradicts the governing law set forth in [the Supreme Court's] cases." <u>Williams v. Taylor</u>, 529

5  U.S. 362, 405 (2000). A state court decision "unreasonably applies" federal law "if the state

6  court identifies the correct rule from [the Supreme Court's] cases but unreasonably applies it to

7  the facts of the particular state prisoner's case." <u>Id.</u> at 407–08. It is not enough that the state

8  court was incorrect in the view of the federal habeas court; the state court decision must be

9  objectively unreasonable. <u>Wiggins v. Smith</u>, 539 U.S. 510, 520–21 (2003).

10      Review under § 2254(d) is limited to the record that was before the state court. <u>Cullen v.</u>

11  <u>Pinholster</u>, 131 S. Ct. 1388, 1398 (2011). The question at this stage is whether the state court

12  reasonably applied clearly established federal law to the facts before it. <u>Id.</u> In other words, the

13  focus of the § 2254(d) inquiry is "on what a state court knew and did." <u>Id.</u> at 1399. Where the

14  state court's adjudication is set forth in a reasoned opinion, § 2254(d)(1) review is confined to

15  "the state court's actual reasoning" and "actual analysis." <u>Frantz v. Hazey</u>, 533 F.3d 724, 738

16  (9th Cir. 2008) (en banc). A different rule applies where the state court rejects claims summarily,

17  without a reasoned opinion. In <u>Richter</u>, <u>supra</u>, the Supreme Court held that when a state court

18  denies a claim on the merits but without a reasoned opinion, the federal habeas court must

19  determine what arguments or theories may have supported the state court's decision, and subject

20  those arguments or theories to § 2254(d) scrutiny. <u>Richter</u>, 562 U.S. at 101.

DISCUSSION

21

22  I.      Claim One: Ineffective Assistance of Counsel – Failure to Present an Eyewitness

23          Identification Expert

24          A. Petitioner's Allegations and Pertinent State Court Record

25      Petitioner alleges that his sole defense theory at trial was misidentification, and defense

26  counsel "emphatically cross-examined both victim eyewitnesses and later argued to [petitioner's]

27  jury that they had misidentified petitioner as the person that had robbed them." ECF No. 1 at 7.

28  Petitioner argues that "it is for that reason that defense counsel was required to present an expert

16

witness/eyewitness identification expert to counter the identifications made." Id. at 8. Petitioner

further argues that the disparities in the crimes and eyewitness testimony "alone would have

called for the eyewitness identification expert to be called for the defense." Id. In support of his

argument, petitioner attaches two declarations: (1) appellate counsel Thea Greenhalgh, and

(2) eyewitness identification expert, Kathy Pezdek, Ph.D. Id. at 9, 24–27, 29–51. Petitioner also

argues that the decision to not call an identification expert "simply makes no sense" and "without

the identification expert, counsel's cross-examination and closing argument became

'uncorroborated' when the expert was the strongest possible defense evidence." Id. at 10.

### B. The Clearly Established Federal Law

To establish a constitutional violation based on ineffective assistance of counsel, a

petitioner must show (1) that counsel's representation fell below an objective standard of

reasonableness, and (2) that counsel's deficient performance prejudiced the defense. Strickland v.

Washington, 466 U.S. 668, 692, 694 (1984). Prejudice means that the error actually had an

adverse effect on the defense. There must be a reasonable probability that, but for counsel's

errors, the result of the proceeding would have been different. Id. at 693–94. The court need not

address both prongs of the Strickland test if the petitioner's showing is insufficient as to one

prong. Id. at 697. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of

sufficient prejudice, which we expect will often be so, that course should be followed." Id.

### C. The State Court's Ruling

This claim was raised on appeal and in the habeas petition presented in conjunction with

the appeal. The California Court of Appeal decision on direct review, ECF No. 18-8 at 221–39,

constitutes the last reasoned decision on the merits because the state supreme court denied

discretionary review, id. at 293. See Ylst v. Nunnemaker, 501 U.S. 797 (1991); Ortiz v. Yates,

704 F.3d 1026, 1034 (9th Cir. 2012). The Court of Appeal ruled as follows:

> The defense in this case was mistaken identity. Counsel presented
> the defense in his opening statement, vigorously cross-examined
> victim-eyewitnesses Mitchell and Raya, and argued
> misidentification extensively in closing argument. The jury was
> instructed on eyewitness identification evidence; the trial court read
> every one of the applicable factors in CALCRIM No. 315.
> Defendant contends, however, that cross-examination was not

17

sufficient to expose the weaknesses inherent in eyewitness evidence and his counsel's failure to present an eyewitness identification expert constituted ineffective assistance of counsel. Defendant contends that an expert witness could have testified regarding the factors affecting the reliability of such evidence, including the effects of fear or stress, the presence of a weapon, and cross-racial identification, and could have provided guidance to the jury in how to follow the instructions on eyewitness testimony.

Defendant does not carry his burden of affirmatively showing that counsel's representation was deficient. "When a claim of ineffective assistance is made on direct appeal, and the record does not show the reason for counsel's challenged actions or omissions, the conviction must be affirmed unless there could be no satisfactory explanation." (*People v. Anderson* (2001) 25 Cal.4th 543, 569.) Here, there may well have been sound strategic reasons for counsel's decision not to call an expert. Defense counsel himself exposed inconsistencies in the eyewitnesses' testimony and, as defendant's brief describes it, "zealously cross-examined both eyewitness victims." Defense counsel also argued that the eyewitnesses' testimony was not credible, and he attacked eyewitness testimony generally as "one of the weakest, most unreliable bits of evidence that we put in Court here . . . ." Counsel relied on the exhaustive list of factors identified in CALCRIM No. 315 that affect the reliability of eyewitness identification testimony—including the eyewitness being under stress, lighting, and cross-racial identification—to argue that the eyewitness testimony should be disbelieved. Counsel could have concluded that these factors were within the jury's common understanding and that he could effectively argue his case without expert testimony.

Counsel also may have made the rational decision to address these issues himself and avoid the risk that cross-examination of an eyewitness identification expert might have *supported* the reliability of the eyewitness identifications in this case, particularly the evidence corroborating Raya's identification. As we have discussed, cell phone records admitted at trial established that the phone number involved in the Raya robbery and the undercover operation was associated with defendant's name and date of birth. The records showed text messages between Raya and defendant on April 7, 2012, and that defendant used the name "La John Hutchins" when arranging to buy marijuana. At trial, Detective Potts identified defendant as the individual who approached him in the church parking lot and as the "David Webb" he knew from prior contacts, including having arrested him for robbery in 2009. Expert testimony strengthening the prosecutor's case that Raya correctly identified defendant, despite the presence of whatever factors the expert identified as reducing reliability, could, in turn, undermine the defense challenge to the Mitchell identification and the benefit of presenting the expert testimony. " 'Since the decision may well have been "an informed tactical choice within the range of reasonable competence, the conviction must be affirmed.

////

18

1    [Citation.]" ' [Citation.]" (*People v. Anderson*, *supra*, 25 Cal.4th at
     pp. 569-570.)

2

3    ECF No. 18-8 at 228–30.

4        To the extent this claim should be deemed exhausted in state habeas, because that is the

5    context in which the state courts were presented with the declaration of plaintiff's eyewitness

6    identification expert, Kathy Pezdek, Ph.D.[5], it was denied without comment.  ECF No. 18-8 at

7    241 (denial by Court of Appeal); id. at 295 (denial by California Supreme Court).  Accordingly,

8    the question under § 2254(d) becomes whether summary denial of the claim was unreasonable in

9    light of the extra-record evidence.

10              D.  Objective Reasonableness Under § 2254(d)

11       It was not unreasonable of the state courts to reject this claim.  Neither the state court's

12   opinion on appeal, nor the summary denial of the claim in light of the Pezdek declaration, can be

13   considered objectively unreasonable.

14       As petitioner recognizes, defense counsel "emphatically cross-examined both victim

15   eyewitnesses and later argued to [petitioner's] jury that they had misidentified petitioner as the

16   person that had robbed them."  ECF No. 1 at 7.  In that regard, defense counsel cross-examined

17   both Mitchell and Raya during the trial in order to overcome their prior and in-court

18   identifications of petitioner.  Counsel emphasized the stress of Mitchell's situation, ECF No. 18-4

19   at 110, questioned Mitchell regarding discrepancies in her prior testimony, id. at 122–24, asked

20   whether anything about the photograph line-up made her rule out other photographs, id. at 144,

21   and questioned Mitchell on whether she knew petitioner had hair, id.

22       Similarly, counsel questioned Raya regarding his recollection of the details of the robbery,

23   including, among other things, challenging the reliability of Raya's identification of the men who

24   robbed him, ECF No. 18-4 at 216, 237–38; Raya's recollection of whether the perpetrators had

25   hair or a shaved head, id. at 217–19, 225, 237–38; and the differences in the darkness of skin

26

27   _____
     [5]  See ECF NO. 18-8 at 164-204 (state habeas petition).  Dr. Pezdek's declaration, Exhibit A, is
28   missing from the copy filed in this court by respondent, but the content of the petition amply
     documents that Dr. Pezdek's opinion was fairly presented to the state court.

between the person Raya identified and the other photographs in the photographic line-up, id. at 221–22. During his closing argument, defense counsel emphasized misidentification, arguing in part that eyewitness identification "is probably one of the weakest, most unreliable bits of evidence that we put in Court here." ECF No. 18-6 at 28. Defense counsel encouraged the jury to find that there was nothing to substantiate Mitchell's identification and Raya was "just mixed up." ECF No. 18-6 at 45–46. In light of the record, it is clear that counsel did, in fact, challenge Mitchell's and Raya's identification directly and vigorously.

Furthermore, as the Court of Appeal noted, "[c]ounsel relied on the exhaustive list of factors identified in CALCRIM No. 315 that affect the reliability of eyewitness identification testimony," and counsel may well have concluded that calling the jury's attention to the "certainty" factor was superfluous in light of the arguments he made. ECF No. 18-8 at 229. See Howard v. Clark, 608 F.3d 563, 574 (9th Cir. 2010) (affirming denial of the petitioner's claim that his attorney rendered ineffective assistance by failing to call as a defense witness an expert on the unreliability of eyewitness testimony, finding that counsel extensively cross-examined two witnesses and, "even more significantly, the jurors were instructed on the potential shortcomings of eyewitness testimony"); see also United States v. Christophe, 833 F.2d 1296, 1300 (9th Cir. 1987) (noting the Ninth Circuit "adhere[s] to the position that skillful cross examination of eyewitnesses, coupled with appeals to the experience and common sense of jurors, will sufficiently alert jurors to specific conditions that render a particular eyewitness identification unreliable").

In light of these considerations, it was not unreasonable for the appellate court to conclude that counsel's decision to rely on cross-examination rather than retaining an expert was within the wide range of reasonable defense strategies.

Moreover, the declaration of Dr. Pezdek (see ECF No. 1 at 29-40) does not render rejection of this claim objectively unreasonable. The undersigned construes the Pezdek declaration as a proffer on the prejudice prong of Strickland. Dr. Pezdek summarizes an extensive body of social science research regarding problems with eyewitness memory and identification. She identifies factors in petitioner's case, including cross-racial identification and

the presence of a hood, that present a heightened risk of unreliable identification. The undersigned does not disagree with Dr. Pezdek that eyewitness expert testimony is more effective (especially from a defense perspective) in educating jurors than simply reading jury instructions. That, however, is not the issue here. The only issue is whether it was unreasonable for the state courts to find no Strickland violation. In light of the record as a whole, including the evidence regarding the Raya robbery and undercover operation, Dr. Pezdek's declaration does not generate a reasonable probability that the result of the proceeding would have been different had she or a similar expert testified. See Strickland, 466 U.S. at 693–94. Without a compelling showing of actual prejudice, it cannot have been objectively unreasonable for the state courts to summarily deny the claim.

For all the above reasons, petitioner is not entitled to relief on this claim.

II.      Claim Two: Ineffective Assistance of Counsel – Failure to Move to Exclude Identification Testimony

A. Petitioner's Allegations and Pertinent State Court Record

Petitioner next contends that trial counsel failed to move for exclusion of Mitchell's identification testimony. ECF No. 1 at 4. Petitioner argues that the circumstances under which Mitchell's robbery took place "should have induced trial counsel to move for exclusion of at least that identification." Id. at 12. According to petitioner, the circumstances include that Mitchell "admitted that the robbery was a traumatizing experience for her" and she denied that the "emotional turmoil could have had an effect on her ability to see and recognize her assailant . . . despite previous testimony that she 'misidentified her own car.'" Id. Petitioner also argues that the photo of petitioner in the lineup "was distinct from the others because petitioner did not have hair in the photo array while all the others did." Id. at 13. Despite all of this, counsel "still chose not to ask for suppression of . . . Mitchell's testimony." Id. In light of Mitchell's misidentification of her own car, petitioner avers that a motion for suppression was critical. Id. Petitioner further argues that suppression "was a 'mainstay requirement' under every strategical or tactical component of a misidentification defense." Id. at 14.

////

21

B.  The Clearly Established Federal Law

The general legal standards pertaining to a claim of ineffective assistance of counsel are provided above.

Regarding admission of a witness's pretrial identification, "convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Simmons v. United States, 390 U.S. 377, 384 (1968); United States v. Givens, 767 F.2d 574, 581 (9th Cir. 1985).  An unduly suggestive line-up alone does not necessarily violate due process; it is the likelihood of misidentification, under the "totality of the circumstances," that constitutes a violation.  Neil v. Biggers, 409 U.S. 188, 198–99 (1972).  A line-up only violates due process if it is both impermissibly suggestive and the resulting identification lacks reliability.  Manson v. Brathwaite, 432 U.S. 98, 106, 114 (1977).

To determine the reliability of identification testimony, courts must examine the totality of the circumstances.  Id. at 114.  Among the factors to consider are: (1) the witness' opportunity to view the criminal at the scene of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior description of the criminal, (4) the witness' level of certainty at the pretrial identification, and (5) the time between the crime and the pretrial identification.  Biggers, 409 U.S. at 199–200.

C.  The State Court's Ruling

This claim was raised on direct appeal.  The California Court of Appeal decision, ECF No. 18-8 at 221–39, constitutes the last reasoned decision on the merits because the state supreme court denied discretionary review, id. at 293.  See Ylst, 501 U.S. 797; Ortiz, 704 F.3d at 1034 (9th Cir. 2012).  The Court of Appeal ruled as follows:

> Defendant contends his trial counsel was ineffective by not seeking to exclude Mitchell's eyewitness and pre-trial identification testimony, which defendant now contends was unreliable based on the circumstances of the robbery and an unduly suggestive photo lineup. Defendant acknowledges that his counsel challenged the credibility of Mitchell's identification through cross-examination and closing argument, but contends counsel's failure to seek

22

exclusion of the identification fell below an objective standard of reasonableness.

An out-of-court identification may be so unreliable that it violates a defendant's due process rights. (*Manson v. Brathwaite* (1977) 432 U.S. 98, 107; *People v. Gordon* (1990) 50 Cal.3d 1223, 1242, overruled on another point in *People v. Edwards* (1991) 54 Cal.3d 787, 835.) "In order to demonstrate that the alleged incompetency of his trial counsel in not objecting to the identification evidence denied him a potentially meritorious defense, the defendant must present a convincing argument that the pretrial identification procedure 'resulted in such unfairness that it infringed his right to due process of law.' [Citations.] Our task is thus to assess the facts and circumstances of the identifications to determine whether they were 'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.' [Citations.]" (*People v. Nation* (1980) 26 Cal.3d 169, 179.)

The initial inquiry in a due process challenge to identification evidence is whether the identification procedure was unduly suggestive and unnecessary. (*Manson v. Brathwaite, supra,* 432 U.S. at pp. 104-107; *People v. Gordon, supra,* 50 Cal.3d at p. 1242.)[6] "The question is whether anything caused defendant to 'stand out' from the others in a way that would suggest the witness should select him." (*People v. Carpenter* (1997) 15 Cal.4th 312, 367, superseded by statute on another ground as noted in *Verdin v. Superior Court* (2008) 43 Cal.4th 1096, 1106, abrogated on another ground in People v. Diaz (2015) 60 Cal.4th 1176, 1185, 1193.) Defendant's argument that the photo lineup was unduly suggestive is as follows: "The distinctive shaved head of [defendant] in the photo line-up shown Ms. Mitchell ultimately was the equivalent of an identification procedure that 'suggests in advance of identification by the witness the identity of the person suspected by the police.' (*People v. Slutts* (1968) 259 Cal.App.2d 886, 891.) Singling out a suspect, which effectively occurred here when [defendant] was the only one without hair, presents the greatest danger of misidentification. (*People v. Nation, supra,* 26 Cal.3d at pp. 180-181.) The sole subject with a shaved head was suggestive because Ms. Mitchell did not see the hair of her assailant. Her subsequent identification at the preliminary hearing merely set the potential misidentification in stone . . . ."

We have examined the photographs and observe that all six photographs depict young adult African-American males. All appear from the shoulders up and are facing forward against blank backgrounds. All appear similar in age, weight, and build. None has any visible jewelry, eyeglasses, or tattoos. All are casually

---

[6] [Footnote 6 in original] Because we conclude the identification procedure itself was not unduly suggestive, we do not reach the second inquiry, "whether the identification itself was nevertheless reliable under the totality of the circumstances . . . ." (*People v. Gordon, supra,* 50 Ca.3d at p. 1242.) The identification is constitutionally unreliable only if the answer to the first question is yes and the second is no. (*Ibid.,* citing *Manson v. Brathwaite, supra,* 432 U.S. at pp. 104-107, 109-114; see also *People v. DeSantis* (1992) 2 Cal.4th 1198, 1222.)

dressed. Some have mustaches and some have hair on their chins. Only defendant's head is shaved, but the other five men have very short hair. Defendant's argument that his photograph was distinct from the others is without merit. Mitchell made clear that she could not see the assailant's hair or hairline during the robbery, and that the hair or hairline of the photographed individuals had no effect on her selecting defendant's photo and excluding the others.[7] Nothing here caused defendant " 'to "stand out" from the others in a way that would suggest the witness should select him.' [Citation.]" (See *People v. Cunningham* (2001) 25 Cal.4th 926, 990.) Defendant has not met his burden of establishing that the photo lineup was impermissibly suggestive.

Defendant's reliance on *People v. Nation*, *supra*, 26 Cal.3d 169 does not advance his argument. In *Nation*, the defendant was accused of approaching three young girls and attempting to rape one of them. Two weeks later, the victim and her two friends went to the police station to try to identify the attacker from photographs. (*Id.* at pp. 173-174.) The three looked at the photographs together. One of the girls, not the victim, selected defendant's mug shot and informed the others that she had found the assailant. After some discussion, the other two agreed. At the time, the victim had been considering a different suspect's photograph. The girls then took the photograph home for a week to show two other possible witnesses, including one of their mothers who reported that a man made a lewd comment to her in the vicinity of the crime later that night. When the girls showed her defendant's photograph, she agreed it depicted the same man who had commented to her. (*Id.* at pp. 174, 180.) At a live lineup two months later, only the mother identified defendant; the three girls selected a different person and were told they had chosen the "wrong" man. (*Id.* at p. 174.) In reversing the defendant's conviction, the *Nation* court found the photographic identification procedure was so extraordinarily suggestive that it was doubtful the prosecutor could have submitted the evidence over a timely objection by defense counsel, and held that counsel's failure to object constituted ineffective assistance of counsel. (*Id.* at pp. 174, 179-181.) By contrast, the identification procedure here involved one witness, Mitchell, who repeatedly and consistently identified defendant both in a photograph and in person, with none of the suggestive and unreliable circumstances present in *Nation*.

We also understand defendant to argue that defense counsel should have sought to exclude Mitchell's in-court identification of defendant because it was "derived from [an] unreliable and potentially suggestive" pretrial identification, and thus resulted in "an additional and separate denial of due process." Having

_____

[7] [Footnote 7 in original] On cross-examination, defense counsel asked Mitchell if she was able to exclude certain photos because of different facial features such as different chins, hair or eyebrows. Mitchell answered, "No. The other ones just didn't look anything like the person that I knew that it was." Counsel asked Mitchell a number of questions about the assailant's hood and defendant's shaved head in the photo. Mitchell testified consistently that she could not see any hair on defendant's head and did not know whether he had any hair because of the hood.

concluded that the pretrial identification procedure here was not unduly suggestive, we necessarily reject this contention.

ECF No. 18-8 at 230–33.

D. Objective Reasonableness Under § 2254(d)

The undersigned has independently reviewed the photographs used during Mitchell's pretrial identification of petitioner and agrees that the identification procedure was not so impermissibly suggestive or tainted as to give rise to a very substantial likelihood of mistaken identification. Simmons, 390 U.S. at 384. The Court of Appeal reasoned that the photographs all depicted young adult African-American males with similar age, weight, and build and no visible personal identifiers. ECF No. 18-8 at 231. Further, Michell made clear during the trial that she could not see petitioner's hair during the robbery and that factor had no effect on her selecting petitioner's photograph over the others. Id. at 231–32. In addition, although not mentioned by the Court of Appeal, Mitchell testified that she would recognize the person who robbed her if she saw him again, ECF No. 18-4 at 101, that his was "a face you don't forget when they're on top of you," id. at 102, that she had no uncertainty as to whether or not petitioner was the person who robbed her, id. at 104, and she "knew for sure from the picture to seeing him in person, [petitioner] was that exact person," id. at 105; see Biggers, 406 U.S. at 199–200 (listing five factors when determining the reliability of identification testimony). Thus, the identification possessed "sufficient aspects of reliability." Manson, 432 U.S. at 106.

In sum, a court must examine the totality of the circumstances to determine the reliability of identification testimony. United States v. Field, 625 F.2d 862, 865–66 (9th Cir. 1980). The court must then weigh the factors of reliability against the "corrupting effect of the suggestive pretrial identification procedure." United States v. Barrett, 703 F.2d 1076, 1085 (9th Cir. 1983) (citing Manson, 432 U.S. at 114). Here, although the California Court of Appeal did not expressly examine each factor outlined in Biggers, its conclusion—that petitioner "has not met his burden of establishing that the photo lineup was impermissibly suggestive," ECF No. 18-8 at 232—is not objectively unreasonable given the totality of the circumstances and the evidence presented at trial, particularly the fact that Mitchell had an opportunity to view petitioner's face

1    up close as he was on top of her at the scene of the crime and her level of certainty at both the

2    pretrial and in-trial identifications.  Biggers, 409 U.S. at 199–200.

3        As a result, petitioner's counsel did not perform unreasonably in deciding not to seek

4    exclusion of the pretrial identification.  Petitioner is not entitled to relief on this claim.

5        III.    Claim Three: Instructional Error – CALCRIM 315

6            A. Petitioner's Allegations and Pertinent State Court Record

7        Petitioner claims he was denied due process when the trial court instructed the jury that it

8    should consider the eyewitness' level of certainty in evaluating the reliability of each witness'

9    identification.  Petitioner argues that "despite compelling reasons for misidentification, both

10   robbery victims 'claimed' that they were 'certain[]' of their identifications of petitioner at trial"

11   and "[b]ased on such testimony, the court instructed them as to" CALCRIM No. 315.  ECF No. 1

12   at 5.  Petitioner further argues that the instruction was erroneous and violated due process, and

13   that the instructional error allowed the prosecution to convict petitioner without meeting its

14   burden of proof.  Id. at 16–17.

15       Petitioner presented this claim on appeal, arguing that his rights to due process and a fair

16   trial were violated when the court instructed the jury pursuant to CALCRIM No. 315 that it could

17   consider the witness' level of certainty when evaluating the eyewitness identification.  See ECF

18   No. 18-8 at 58–65.  Petitioner argued in part that "even though jurors tend to place greater

19   reliance on eyewitnesses who exhibit confidence in their identification, jurors do not generally

20   understand that eyewitness confidence is not a reliable predictor of accuracy.  To the extent that

21   CALCRIM No. 315 perpetuates this myth in the face of overwhelming scientific evidence to the

22   contrary, it is erroneous."  Id. at 58.  The Court of Appeal denied the claim in a reasoned opinion.

23   See id. at 233–35.

24           B. The Clearly Established Federal Law

25       Federal habeas corpus relief does not lie for errors of state law; and a claim that a state

26   court failed to follow its own state law in regard to jury instructions given at trial does not

27   necessarily invoke a federal constitutional question.  See Estelle v. McGuire, 502 U.S. 62, 71–72

28   (1991).  In order to warrant federal habeas relief, a challenged jury instruction must violate due

1   process to the extent that "'the ailing instruction by itself so infected the entire trial that the

2   resulting conviction violates due process.'" Id. (quoting Cupp v. Naughten, 414 U.S. 141, 147

3   (1973)).

4       "The burden of demonstrating that an erroneous instruction was so prejudicial that it will

5   support a collateral attack on the constitutional validity of a state court's judgment is even greater

6   than the showing required to establish plain error on direct appeal." Henderson v. Kibbe, 431

7   U.S. 145, 154 (1977).  A defendant is not entitled to a specific instruction provided that other

8   instructions, in their entirety, adequately inform the jury of the defense theory of a case.  United

9   States v. Del Muro, 87 F.3d 1078, 1081 (9th Cir. 1996).

10      A "slight *possibility*" that the jury misapplied the instruction is not enough to warrant

11  habeas relief.  Waddington v. Sarausad, 555 U.S. 179, 191 (2009).  Rather, an ambiguous

12  instruction violates due process only when there is a "reasonable likelihood" that the jury has

13  applied the challenged instruction in a way that violates the Constitution.  Id. at 190–91; Estelle,

14  502 U.S. at 72 & n.4 (1991).  In making this determination, the reviewing court must not view the

15  instruction in artificial isolation, but must consider it in the context of the trial record and the

16  instructions as a whole.  Estelle, 502 U.S. at 72.  In other words, the court must evaluate jury

17  instructions in the context of the overall charge to the jury as a component of the entire trial

18  process.  See Cupp, 414 U.S. at 147 (explaining that the challenged instructional error must be

19  assessed not by focusing on the alleged faulty instruction in isolation, but by considering its effect

20  in the context of the overall charge).

21          C.  The State Court's Ruling

22      This claim was raised on direct appeal.  The California Court of Appeal decision, ECF

23  No. 18-8 at 221–39, constitutes the last reasoned decision on the merits because the state supreme

24  court denied discretionary review, id. at 293.  See Ylst, 501 U.S. 797; Ortiz, 704 F.3d at 1034 (9th

25  Cir. 2012).  The Court of Appeal ruled as follows:

26          Defendant contends his rights to due process and a fair trial were
            violated by the court's instruction pursuant to CALCRIM No. 315
27          that the jury could consider the witness's level of certainty as one of

28

                                        27

many factors in evaluating the eyewitness identification testimony.[8] At trial, both Mitchell and Raya testified that they were positive of their identification of defendant, and the prosecutor emphasized their certainty in his closing argument. Citing research and cases from other states on the reliability of eyewitness identification, defendant argues that there is no established correlation between a witness's certainty and the accuracy of that identification and jurors do not generally understand that eyewitness confidence is not a reliable predicator of accuracy. "To the extent that CALCRIM No. 315 perpetuates this myth," defendant contends, the instruction "is erroneous."

As an initial matter, we address the Attorney General's contention that defendant forfeited any claim of error by failing to object or request modification of this instruction in the trial court. Pursuant to section 1259, we may review any claim of instructional error that affects a defendant's substantial rights, without regard to whether an objection was made below. "Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim . . . ." (*People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249.) We will, therefore, address defendant's contention, but conclude it has no merit.

In *People v. Wright* (1988) 45 Cal.3d 1126, 1141 (*Wright*), the Supreme Court expressly approved a version of CALJIC No. 2.92, the predecessor to CALCRIM No. 315, that told the jury to consider the degree of certainty in assessing the reliability of eyewitness identification evidence.[9] (Accord, *People v. Johnson* (1992) 3 Cal.4th 1183, 1231-1232 (*Johnson*), superseded by statute on another ground as noted in *Verdin v. Superior Court, supra*, 43

[8]  [Footnote 8 in original] The trial court instructed the jury with CALCRIM No. 315 in its entirety, which provides: "You have heard eyewitness testimony identifying the defendant. As with any other witness, you must decide whether an eyewitness gave truthful and accurate testimony. [¶] In evaluating identification testimony, consider the following questions: Did the witness know or have contact with the defendant before the event? How well could the witness see the perpetrator? What were the circumstances affecting the witness's ability to observe, such as lighting, weather conditions, obstructions, distance, and duration of observation? How closely was the witness paying attention? [¶] Was the witness under stress when he or she made the observation? Did the witness give a description and how does that description compare to the defendant? How much time passed between the event and the time when the witness identified the defendant? Was the witness asked to pick the perpetrator out of a group? Did the witness ever fail to identify the defendant? [¶] Did the witness ever change his or her mind about the identification? *How certain was the witness when he or she made an identification?* Are the witness and the defendant of different races? Was the witness able to identify the defendant in a photographic or physical lineup? Were there other circumstances affecting the witness's ability to make an accurate identification? [¶] The People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the[se] crime[s]. If the People have not met this burden, you must find the defendant not guilty." (Emphasis added.)

[9]  [Footnote 9 in original] CALJIC No. 2.92 instructs the jury to consider 13 enumerated factors including "[t]he extent to which the witness is either certain or uncertain of the identification."

Cal.4th at p. 1106.) "We hold that a proper instruction on eyewitness identification factors should focus the jury's attention on facts relevant to its determination of the existence of reasonable doubt regarding identification, by listing, in a neutral manner, the relevant factors supported by the evidence. [¶] The instruction should *not* take a position as to the *impact* of each of the psychological factors listed." (*Wright*, *supra*, 45 Cal.3d at p. 1141.) Further, "the listing of factors to be considered by the jury will sufficiently bring to the jury's attention the appropriate factors, and . . . an explanation of the *effects* of those factors is best left to argument by counsel, cross-examination of the eyewitnesses, and expert testimony where appropriate." (*Id.* at p. 1143.)

The certainty factor in CALCRIM No. 315 is indistinguishable in substance from that set forth in CALJIC No. 2.92 and approved in *Wright* and *Johnson*. Notwithstanding defendant's claim that courts in other states have rejected witness certainty as a valid factor for a jury to consider in deciding the reliability of eyewitness identification testimony, we are bound by California Supreme Court precedent, and thus find no error. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

ECF No. 18-8 at 233–35.

### D. Objective Unreasonableness Under § 2254(d)

The court of appeal was not objectively unreasonable in denying this claim. A review of the "certainty" language in CALCRIM No. 315 shows that it is framed in neutral terms and only one among fourteen nonexclusive factors that the jury was instructed it could consider in weighing the accuracy of identification evidence. See ECF No. 18-6 at 66–67. The instruction itself begins by telling the jury that it "must decide whether an eyewitness gave truthful and accurate testimony." Id. Petitioner has not identified anything in the record that demonstrates the eyewitness identification instruction so infected the trial that his conviction violated due process.

Further, the studies petitioner relies on are not clearly established federal law as interpreted by the Supreme Court, which is the only basis upon which this court may grant federal habeas relief. See Williams, 529 U.S. at 412–13 (explaining that a writ may issue only if one of two conditions is satisfied: the state-court adjudication resulted in a decision that (1) was contrary to, or (2) involved an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States). Petitioner's theory regarding the invalidity of CALCRIM No. 315 is inconsistent with Supreme Court precedent, which holds:

////

[T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, *the level of certainty demonstrated by the witness at the confrontation*, and the length of time between the crime and the confrontation.

Biggers, 409 U.S. at 199–200 (emphasis added).  Given that some of the factors listed in CALCRIM No. 315 are identified by the Supreme Court as essential factors in evaluating misidentification, the instruction cannot amount to a due process violation.

The Court of Appeal reasonably determined that petitioner was not denied a fair trial when the jury was instructed with CALCRIM No. 315.  Petitioner is not entitled to relief on this claim.

## IV.     Claim Four: Prosecutorial Misconduct

### A.  Petitioner's Allegations and Pertinent State Court Record

Petitioner argues that the prosecutor improperly vouched for both robbery victims in his closing argument and therefore went beyond the scope of proper argument.  ECF No. 1 at 5. Petitioner takes issue with the following from the prosecutor's closing argument regarding Mitchell:

We want credible testimony from people about what they observed . . . [and] that [her assailant's] face is burned into [Mitchell's] memory.

. . .

That would take a soulless, horrible person, and whatever evidence you have in this case, there is no evidence, or none reasonably, that Ms. Mitchell is that sort of human being that would do that to Mr. Webb, (indicating), unless she was sure.

She wasn't so angry about what happened that she wanted to have someone held responsible.  She saw him do it, and she told you about it, and you should convict him on it.  It's as simple as that, if the system works.

ECF No. 1 at 18; see also RT 601–02.  Regarding Raya, petitioner takes issue with the following from the prosecutor's closing argument:

[I]t would take an evil, horrible person to sit up there on the witness stand, knowing generally what's at stake in this sort of situation, and without being a hundred percent sure, even though they're

testifying that they're a hundred percent sure, point to him and say,
"He's the one that robbed me".

ECF No. 1 at 19; see also RT 601.  Petitioner further argues that the prosecutor's closing

argument was nothing less than vouching "for these two witnesses where based on the evidence

concerning both robberies their testimony would be the deciding factor as to both guilt or

innocence."  ECF No. 1 at 5, 20–22.  Petitioner relies in part on the declaration of Dr. Kathy

Pezdek in support of his argument.  See ECF No. 1 at 29–51.

B.  The Clearly Established Federal Law

In reviewing prosecutorial misconduct claims, "[t]he relevant question is whether the

prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a

denial of due process.'"  Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v.

DeChristoforo, 416 U.S. 637 (1974)).  "To constitute a due process violation, the prosecutorial

misconduct must be of sufficient significance to result in the denial of the defendant's right to a

fair trial."  Greer v. Miller, 483 U.S. 756, 765 (1987) (quotations omitted) (citing United States v.

Bagley, 473 U.S. 667, 676 (1985)).  "[T]he touchstone of due process analysis in cases of alleged

prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor."  Smith

v. Phillips, 455 U.S. 209, 219 (1982).  "[I]t is not enough that the prosecutors' remarks were

undesirable or even universally condemned."  Darden, 477 U.S. at 181 (quotations and citation

omitted).  In other words, "[i]mproper argument does not, per se, violate a defendant's

constitutional rights."  Thompson v. Borg, 74 F.3d 1571, 1576 (9th Cir. 1996) (quoting Jeffries v.

Blodgett, 5 F.3d 1180, 1191 (9th Cir. 1993)).  Finally, any claim of prosecutorial misconduct is

reviewed within the context of the entire trial, Greer, 483 U.S. at 765–66, and the standard of

review is "the narrow one of due process, . . . not the broad exercise of supervisory power."

Donnelly, 416 U.S. at 642.

C.  The State Court's Ruling

This claim was raised on direct appeal.  The California Court of Appeal decision, ECF

No. 18-8 at 221–39, constitutes the last reasoned decision on the merits because the state supreme

court denied discretionary review, id. at 293.  See Ylst, 501 U.S. 797; Ortiz, 704 F.3d at 1034 (9th

Cir. 2012).  The Court of Appeal ruled as follows:

> Finally, defendant contends the prosecutor engaged in misconduct during closing arguments when he impermissibly vouched for the credibility of two of the witnesses, Mitchell and Raya.
>
> In closing, the prosecutor argued: "What we do want is, we want credible testimony from people about what they observed, so you could imagine that when someone goes through an event like Ms. Mitchell went through, she's not keeping track of time; she's not making measure of distances, but when she's got that person laying [sic] on top of her face-to-face, inches away, jamming a gun into her side, that face is burned into her memory.
>
> "And she sat here in front of you and she pointed to the defendant, I don't know how many times, I don't know how many different ways, and said, 'I don't have any doubt that that is the person that robbed me at gunpoint on that day,' that's the way you want your system to work, so someone like that can get justice.
>
> "Let's talk about the sort of person that you would have to believe Ms. Mitchell to be in order for her to say those sort of things under oath and not really know it for sure.  She understands, and I hope you remember this little line of questioning that I tried to go through with each Ms. Mitchell and Mr. Raya, about whether or not they understood just generally the consequences of someone being identified as a robber being brought to trial and that sort of thing.
>
> "The point of that was very specific, and that is that it would take an evil, horrible person to sit up there on the witness stand, knowing generally what's at stake in this sort of situation, and without being a hundred percent sure, even though they're testifying that they're a hundred percent sure, point to him and say, 'He's the one that robbed me.'  That would take a soulless, horrible person, and whatever evidence you have in this case, there is no evidence, or none reasonably, that Ms. Mitchell is that sort of human being that would do that to Mr. Webb, (indicating), unless she was sure.
>
> "She wasn't so angry about what happened that she wanted to have someone held responsible.  She saw him do it, and she told you about it, and you should convict him on it.  It's as simple as that, if the system works.
>
> "The same thing is true for Mr. Raya. . . ."
>
> "The standards governing review of misconduct claims are settled. 'A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such " 'unfairness as to make the resulting conviction a denial of due process.' " ' (*Darden v. Wainwright* (1986) 477 U.S. 168, 181; see *People v. Cash* (2002) 28 Cal.4th 703, 733.) 'Under state law, a prosecutor who uses such methods commits misconduct even when those actions do not result in a fundamentally unfair trial.'

32

(*People v. Alfaro* (2007) 41 Cal.4th 1277, 1328.) 'In order to preserve a claim of misconduct, a defendant must make a timely objection and request an admonition; only if an admonition would not have cured the harm is the claim of misconduct preserved for review.' (*Ibid.*) When a claim of misconduct is based on the prosecutor's comments before the jury, ' "the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." ' (*People v. Smithey* (1999) 20 Cal.4th 936, 960, quoting *People v. Samayoa* (1997) 15 Cal.4th 795, 841.)" (*People v. Friend* (2009) 47 Cal.4th 1, 29.)

Defendant did not object to the prosecutor's statements and did not request that the jury be admonished, and he has, therefore, forfeited these claims on appeal.  (See *People v. Alfaro, supra*, 41 Cal.4th at p. 1328.)  Attempting to avoid this result, defendant first contends the issue is preserved because he raised it in his motion for new trial. However, such argument was not itself timely.[10] "It is well settled that making a timely and specific objection at trial, and requesting that the jury be admonished (if jury is not waived), is a necessary prerequisite to preserve a claim of prosecutorial misconduct for appeal. [Citations.] 'The primary purpose of the requirement that a defendant object at trial to argument constituting prosecutorial misconduct is to give the trial court an opportunity, through admonition of the jury, to correct any error and mitigate any prejudice.' [Citation.]" (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1328, emphasis added.)

Second, defendant contends an admonition would not have cured the harm caused by the misconduct. The record does not support this argument. Shortly before the portion of the argument defendant is now challenging, defense counsel objected on a different ground, and his objection was sustained. Shortly after the now-challenged remarks, defense counsel again raised an objection. After a brief colloquy, the court overruled the objection, noting "I've already indicated to the jury that I will be giving them the law regarding how to interpret witness testimony . . . ." The court considered and ruled on various objections by both sides during closing arguments. There was no reason for defense counsel to think that any objection would have been futile or that an admonition could not cure any perceived harm. On the contrary, an appropriate admonition would have corrected any error.

But even reaching the merits, the contention fails. "To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or

_____

[10]  [Footnote 10 in original] Defendant's prosecutorial misconduct argument in his motion for new trial was based on alleged references by the prosecutor to defendant's failure to present a defense, so-called *Griffin* error (*Griffin v. California* (1965) 380 U.S. 609, 615). Arguably, this was insufficient to preserve the claim defendant seeks to raise on appeal for the additional reason that it was not even based on the same ground (misconduct by vouching for witnesses). (See e.g., *People v. Hill* (1998) 17 Cal.4th 800, 820 [a specific objection on the same ground is required to preserve an issue of prosecutorial misconduct for appeal].)

33

applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. [Citation.]" (*People v. Frye* (1998) 18 Cal.4th 894, 970, disapproved on another point in *People v. Doolin* (2009) 45 Cal.4th 930, 421, fn. 22.) "As a general matter, '[i]mpermissible "vouching" may occur where the prosecutor places the prestige of the government behind a witness through personal assurances of the witness's veracity or suggests that information not presented to the jury supports the witness's testimony.' (*People v. Fierro* (1991) 1 Cal.4th 173, 211, overruled on another ground in *People v. Thomas* (2012) 54 Cal.4th 908, 941.) Similarly, evidence of a prosecutor's subjective motivations when prosecuting a case is not relevant, for '[i]t is misconduct for prosecutors to bolster their case "by invoking their personal prestige, reputation, or depth of experience, or the prestige or reputation of their office, in support of it." [Citation.] Similarly, it is misconduct "to suggest that evidence available to the government, but not before the jury, corroborates the testimony of a witness." [Citation.] The vice of such remarks is that they "may be understood by jurors to permit them to avoid independently assessing witness credibility and to rely on the government's view of the evidence." [Citation.]' (*People v. Bonilla* (2007) 41 Cal.4th 313, 336.)" (*People v. Seumanu*, *supra*, 61 Cal.4th at pp. 1329-1330, fn. omitted.)

Defendant concedes that the prosecutor, by his comments, was not attempting to bring in evidence from outside the record. Rather, defendant contends the prosecutor personally vouched for the witnesses' credibility, placing the prestige of the government behind them, and infringing on defendant's right to have the jury make an independent credibility determination. We disagree. Although the prosecutor urged the jury to believe Mitchell and Raya, the argument was based on their demeanor and testimony at trial. Based on the record, the prosecutor could reasonably argue that Mitchell would not have identified defendant repeatedly and testified confidently that he was the robber if she had any doubt. "[S]o long as a prosecutor's assurances regarding the apparent honesty or reliability of prosecution witnesses are based on the 'facts of [the] record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief,' [his] comments cannot be characterized as improper vouching. [Citations.]" (*People v. Frye*, supra, 18 Cal.4th at p. 971.) Moreover, contrary to defendant's argument, the prosecutor did not suggest that "only a 'soulless, horrible' person could possibly be mistaken in their identification . . . ." The prosecutor's comments did not address the possibility that the eyewitnesses made a *mistake*, understandably, since mistake was the defense theory. We find the complained-of remarks to be proper comment on the evidence at trial and reasonable inferences flowing from that evidence, and not improper vouching by the prosecutor.

ECF No. 18-8 at 235–39.

34

D.  Objective Unreasonableness Under § 2254(d)

2       As a preliminary matter, respondent argues that this claim is procedurally defaulted

3   because petitioner's trial counsel failed to make a contemporaneous objection to the prosecutor's

4   statements during closing argument.  ECF No. 17-1 at 26.  The state court of appeal recognized

5   that the failure to object forfeited this claim, but nevertheless reached its merits.  ECF No. 18-8 at

6   236–37.  A federal habeas court may bypass a procedural default to reach the merits of a clearly

7   non-meritorious claim.  See Lambrix v. Singletary, 520 U.S. 518, 525 (1997) (explaining that

8   federal courts are not required to address a procedural-default issue before deciding against the

9   petitioner on the merits).  The court elects to do so with respect to this claim.

10      The essence of petitioner's claim is that he was prejudiced by the prosecutor's

11  impermissible "vouching" for Mitchell and Raya.  The Court of Appeal determined in part that, in

12  light of the record as a whole, the prosecutor could reasonably argue that Mitchell would not have

13  identified petitioner repeatedly and confidently at trial if she had any doubt, and that the

14  prosecutor permissibly urged the jury to believe Mitchell and Raya based on "their demeanor and

15  testimony at trial."  ECF No. 18-8 at 238.  In the context of the entire trial, the Court of Appeal

16  was not unreasonable in finding that the prosecutor's comments did not deprive petitioner of a

17  fair trial.

18      The prosecutor did not place the prestige of the government behind Mitchell and Raya by

19  providing personal assurances of their veracity, nor did he suggest that their testimony is

20  supported by information outside that presented to the jury.  See United States v. Stinson, 647

21  F.3d 1196, 1212 (9th Cir. 2011) (citing United States v. Wright, 625 F.3d 583, 610 (9th Cir.

22  2010)).  Instead, the prosecutor's comments regarding the reliability of Mitchell's and Raya's

23  testimony were grounded in the evidence showing that both victims were confident in their

24  identification of petitioner as the man who robbed them.  See, e.g., ECF No. 18-4 at 104 (Mitchell

25  testified that she did not have any uncertainty as to whether or not petitioner was the person who

26  robbed her); id. at 205 (Raya testified he was certain about who he was identifying as the person

27  who robbed him).  The prosecutor's argument that Mitchell and Raya told the truth "was not

28  vouching but was 'simply an inference from evidence in the record.'"  United States v. Wilkes,

662 F.3d 524, 540 (9th Cir. 2011) (quoting United States v. Necoechea, 986 F.2d 1273, 1279 (9th Cir. 1993) (explaining that a prosecutor improperly vouches where he makes statements that bolster a government witness's credibility by referring to facts not in the record, such as explaining why a witness did not testify against codefendants)).

For these reasons, this court cannot conclude that petitioner was deprived of a fair trial by the prosecutor's statements. Nothing in Dr. Pezdek's declaration, even assuming it was fairly presented to and considered by the state courts in this context, renders rejection of the claim objectively unreasonable. Petitioner is not entitled to relief on this claim.

CONCLUSION

For all the reasons explained above, the state courts' denial of petitioner's claims was not objectively unreasonable within the meaning of 28 U.S.C. § 2254(d). Accordingly, IT IS HEREBY RECOMMENDED that the petition for writ of habeas corpus be DENIED. It is FURTHER RECOMMENDED that a certificate of appealability, see 28 U.S.C. § 2253(c), be DENIED.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. §636(b)(l). Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." If petitioner files objections, he shall also address whether a certificate of appealability should issue and, if so, why and as to which issues. See 28 U.S.C. § 2253(c)(2). Any reply to the objections shall be served and filed within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: October 29, 2019

ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE